# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-24346-CIV-GAYLES/OTAZO-REYES

MANACASH KEFEENIE,

    Plaintiff,

v.

THE GLORIA MARTIN TRUST,

    Defendant.

_____/

## ORDER

**THIS CAUSE** comes before the Court upon Defendant **THE GLORIA MARTIN TRUST's** (the "Trust") Summary Judgment Motion [ECF No. 48]. The Court has carefully reviewed the Motion, the record, and the applicable law. For the reasons set forth below, the Motion is granted.

## BACKGROUND

**A.**    **Factual Background**

From the mid-1990s to 2005, Gloria Martin ("Mrs. Martin") employed Plaintiff **MANACASH KEFEENIE** (properly, Manachash Kefenie) as a live-in domestic service employee. [ECF No. 47 ¶ 1]. In 2010, Mrs. Martin re-hired Plaintiff when her live-in domestic service employee resigned. [*Id.* ¶ 2]. From 2010 until May 2015, Plaintiff performed services as Mrs. Martin's live-in domestic service employee and slept in Mrs. Martin's residence for, at least, five nights each week. [*Id.* ¶ 3].

By 2011 or 2012, Mrs. Martin encountered memory loss problems and other significant health issues. [*Id.* ¶ 4]. Unfortunately, Mrs. Martin's mental and physical condition deteriorated and she rapidly evidenced signs of dementia. [*Id.*]. By May 2015, Mrs. Martin was unable to take care of herself. [*Id.* ¶ 5].

In 2003, Mrs. Martin established and funded the Trust via the Gloria Martin Declaration of Trust dated June 25, 2003, as amended. [*Id.* ¶ 6]. The Trust is an estate-planning vehicle known as a "living trust" designed, in part, to protect Mrs. Martin in the event of her incapacity. [*Id.*]. Louis Nostro, Esq., who has been Mrs. Martin's estate-planning attorney since 2003, and Rabbi Schmuel Kalos, who has been Mrs. Martin's spiritual advisor since the 1990s, are the designated trustees (the "Trustees"). [*Id.* ¶ 7].

In May 2015, the Trust commenced acting on Mrs. Martin's behalf and managing her assets as a result of her incapacity. [*Id.* ¶ 8]. Given Mrs. Martin's illness and disability, as well as her inability to care for herself, the Trust retained Plaintiff as a live-in domestic service employee. [*Id.* ¶ 9]. Plaintiff continued to reside and sleep in Mrs. Martin's residence for, at least, five nights each week. [*Id.* ¶ 10].

Plaintiff's employment as a live-in domestic service employee was at-will. [*Id.* ¶ 11]. From May 2015 until May 2016, the Trust attempted to formalize Plaintiff's employment relationship through a written employment agreement. [*Id.* ¶ 12]. However, Plaintiff rejected every offer the Trust made for a written employment agreement. [*Id.*].

In August 2015, the Trust presented Plaintiff with a proposed employment offer. [*Id.* ¶ 13]. However, Plaintiff rejected the Trust's offer, and requested the following:

> If possible I want be there and work for Ms. Martin as long as she lives. If not I need **3-4 years of job security**. This is very important to me because throughout all these years (with the exception of the last 2 years) I was not getting paid what I deserved comparing to the amount of hours I worked and my loyalty to her.

[*Id.*]. Concerned about Mrs. Martin's need to be attended by someone whom she recognized given her incapacity, Plaintiff and the Trustees met and discussed employment terms from August to November 2015. [*Id.* ¶ 14].

In November 2015, the Trust presented Plaintiff with a written employment agreement based on the parties' discussions. [*Id.* ¶ 15]. In fact, the Trustees signed the proposed employ-

- 2 -

ment agreement. [*Id.*]. The proposed employment agreement more than doubled Plaintiff's monthly wages. [*Id.*]. However, Plaintiff rejected the employment agreement and requested additional terms, claiming that she may have potential claims against Mrs. Martin. [*Id.* ¶ 16].

From December 2015 through January 2016, the Trustees met with Plaintiff and presented her with additional employment terms. [*Id.* ¶ 17]. However, Plaintiff continued to reject the Trust's employment offers. [*Id.*].

On February 3, 2016, the Trust presented Plaintiff with an employment offer, which also included a resolution of Plaintiff's purported claims against Mrs. Martin. [*Id.* ¶ 18]. Plaintiff rejected the Trust's February 3, 2016 offer. [*Id.* ¶ 19].

From February to May 2016, the Trust continued to negotiate with Plaintiff to reach an acceptable employment agreement. [*Id.* ¶ 20]. However, Plaintiff demanded lifetime employment, and that the Trust purchase a residence for her, provide her with lump sum settlement payments tax free, give her a guaranteed pension for life (beginning prior to normal retirement age), pay her a six figure annual salary, and pay her federal income taxes for the remainder of her life. [*Id.* ¶ 21]. The Trust rejected Plaintiff's employment demands. [*Id.* ¶ 22].

On May 20, 2016, the Trust conveyed its final offer for a written employment agreement between the parties. [*Id.* ¶ 23]. The Trust's offer provided settlement payments, significant wage increases, a one year's guaranteed pay should Mrs. Martin pass away during the employment agreement's first year, one-year's severance should Plaintiff be terminated without cause, significant retirement benefits, and the purchase of an annuity for Plaintiff. [*Id.* ¶ 24]. However, Plaintiff rejected the Trust's employment offer and made additional financial demands. [*Id.* ¶ 25].

On May 23, 2016, Plaintiff informed the Trustees that she was packing her belongings and leaving her employment. [*Id.* ¶ 26]. On June 2, 2016, the Trust informed Plaintiff that, giv-

en her rejection of the last employment offer and her statement that she was packing and leaving, the Trust considered her to have resigned:

> The Gloria Martin Trust has attempted for several months to finalize an employment agreement with you. As you know, the employment terms offered to you were extremely generous. Unfortunately, you have rejected all of our prior offers. You have demanded, among other things, that we fund the purchase of a residence, lump sum payments, a guaranteed pension for life (beginning prior to normal retirement age), a six figure annual salary and that the Trust pay all income taxes on lump sum benefits paid to you.
>
> We last spoke by telephone on Monday, May 23, 2016 about your continued employment. You declined our latest employment offer and made, in my view, additional unreasonable financial demands. You told me that you were packing your belongings and leaving. I informed you that you should do so and that we have to part ways.

[*Id.* ¶ 27].

The Trust fully compensated Plaintiff for the time that she worked. [*Id.* ¶ 28]. In May 2015, Plaintiff informed the Trust that Mrs. Martin allegedly owed her a total of $18,700 in back wages for the period from January 17 to May 16, 2015. [*Id.* ¶ 29]. Accordingly, the Trust paid Plaintiff the alleged back wages that Mrs. Martin owed. [*Id.*].

From May 2015 to May 2016, the Trust paid Plaintiff $99,093.10. [*Id.* ¶¶ 30-41]. After her separation of employment, Plaintiff alleged that she was purportedly owed one week's pay ($1,875.00). [*Id.* ¶ 42]. Pursuant to her allegation, on August 4, 2016, the Trust paid Plaintiff $1,875.00 via Check No. 769. [*Id.*].

### B.     Procedural Background

On December 21, 2016, Plaintiff filed this lawsuit in state court. [*See* ECF No. 1-4]. At the time, two law firms represented Plaintiff: Forrest Sygman, P.A. (including Forrest Sygman, Esq., and Dana Esposito, Esq.) and Brian H. Pollock, Esq. The parties agreed to an early mediation, which took place on January 30, 2017. On February 2, 2017, three days after mediation, Plaintiff's attorneys filed their motion to withdraw as counsel. [*See* ECF No. 1-8 & 1-9].

On July 12, 2017, Plaintiff filed her Amended Complaint against the Trust through attorney Dameka L. Davis, Esq. [*See* ECF No. 1-23]. On November 28, 2017, Plaintiff filed her Second Amended Complaint (incorrectly titled "Third Amended Complaint"). [*See* ECF No. 1-2]. That same day, Ms. Davis filed her motion to withdraw as counsel. [*See* ECF No. 1-33]. On December 1, 2017, the Trust filed its Notice of Removal.

Plaintiff sues the Trust alleging breach of oral employment contract (Count I); breach of contract (Count II); unjust enrichment (Count III); fraud in the inducement (Count IV); and overtime violations under the Fair Labor Standards Act (the "FLSA") (Count V). In sum, Plaintiff alleges that the Trust failed to (i) pay her a monthly salary of $2,816.00, (ii) grant her lifetime employment, and (iii) provide overtime pay for the 136 hours that she purportedly worked each week.

### STANDARD OF REVIEW

Summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), "is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton,* 134 S. Ct. 1861, 1866 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a)). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of

material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue is "genuine" when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party in light of his burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). "Where the material facts are undisputed and all that remains are questions of law, summary judgment may be granted." *Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs.,* 818 F.3d 1122, 1138 (11th Cir. 2016). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *SEC v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014). However, to prevail on a motion for summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.,* 780 F.3d 1039, 1050 (11th Cir. 2015).

Before proceeding further, the Court instructs that it "places great emphasis upon, and implores the parties to be mindful of, the fact that local rules have 'the force of law.'" *State Farm Mut. Auto. Ins. Co. v. B&A Diagnostic, Inc.,* 145 F. Supp. 3d 1154, 1158 (S.D. Fla. 2015) (quoting *Hollingsworth v. Perry,* 558 U.S. 183, 191 (2010)). Southern District of Florida Local Rule 56.1 requires that "[a] motion for summary judgment and the opposition thereto shall be accompanied by a statement of material facts as to which it is contended that there does not exist a genuine issue to be tried or there does exist a genuine issue to be tried, respectively," S.D. Fla. L.R. 56.1(a). A statement shall, inter alia, "[b]e supported by specific references to pleadings, depositions, answers to interrogatories, admissions, and affidavits on file with the Court." *Id.* R. 56.1(a)(2). Local Rule 56.1(b), which governs the effect of a nonmovant's failure to controvert a

- 6 -

movant's statement of undisputed facts, provides: "All material facts set forth in the movant's statement filed and supported as required above *will be deemed admitted* unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record." *Id.* R. 56.1(b) (emphasis added). This rule "serves a vital purpose in 'help[ing] the court identify and organize the issues in the case.'" *B&A Diagnostic,* 145 F. Supp. 3d at 1158 (quoting *Mann v. Taser Int'l, Inc.,* 588 F.3d 1291, 1303 (11th Cir. 2009)). "It also preserves scarce judicial resources by preventing a court from 'having to scour the record and perform time-intensive fact searching.'" *Id.* (quoting *Joseph v. Napolitano*, 839 F. Supp. 2d 1324, 1329 (S.D. Fla. 2012)).

Given the purpose that these rules serve, "litigants ignore them at their peril." *Caban Hernandez v. Philip Morris USA, Inc.,* 486 F.3d 1, 7 (1st Cir. 2007). Here, the Trust filed a Statement of Undisputed Material Facts in support of its summary judgment motion, [*see* ECF No. 47], which the Court finds is supported and complies with all requirements of Local Rule 56.1. Plaintiff has failed to properly controvert the Trust's Statement and, therefore, pursuant to Local Rule 56.1(b), all facts contained within that Statement are hereby deemed admitted.

Plaintiff's *pro se* status does not alter this determination. "[A]lthough [courts] are to give liberal construction to the pleadings of pro se litigants," those litigants are "nevertheless ... required ... to conform to procedural rules." *Albra v. Advan, Inc.,* 490 F.3d 826, 829 (11th Cir. 2007) (citation and internal quotation marks omitted); *see also Smith v. Mercer*, 572 F. App'x 676, 678 (11th Cir. 2014) (per curiam) (affirming a district court's decision to deem admitted the moving party's facts under that district's analog to S.D. Fla. Local Rule 56.1(b) where the *pro se* nonmoving party's response failed to comply with that district's analog to S.D. Fla. Local Rule 56.1(a)). Because Plaintiff "has failed to comply with Local Rule 56.1—the only permissible way for [her] to establish a genuine issue of material fact at [this] stage—the [C]ourt has before

it the functional analog of an unopposed motion for summary judgment." *Mann*, 588 F.3d at 1303 (quoting *Reese v. Herbert*, 527 F.3d 1253, 1258 (11th Cir. 2008)).

Although Plaintiff failed to timely respond to the Trust's Summary Judgment Motion or timely file an opposing statement of material facts, the Court "cannot base the entry of summary judgment on the mere fact that the motion was unopposed." *United States v. 5800 S.W. 74th Ave.,* 363 F.3d 1099, 1101 (11th Cir. 2004). "Even in an unopposed motion [for summary judgment], ... 'the movant is not absolve[d] ... of the burden of showing that it is entitled to a judgment as a matter of law,'" and the Court "must still review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact." *Mann,* 588 F.3d at 1303 (quoting *Reese,* 527 F.3d at 1268). To that end, the Court must "consider the merits of the motion" and "review all of the evidentiary materials submitted in support of the motion," *5800 S.W. 74th Ave.,* 363 F.3d at 1101-02, in order to "satisfy itself that the [movant's] burden has been satisfactorily discharged." *Reese*, 527 F.3d at 1268.

## ANALYSIS

**I.   BREACH OF ORAL EMPLOYMENT CONTRACT AND UNJUST ENRICHMENT CLAIMS**

In Count I (Breach of Oral Employment Contract), Plaintiff alleges that she was promised a monthly wage of $2,816.00 to be Mrs. Martin's sole caretaker, and that she was not paid her wages:

> 36. Plaintiff entered into an oral contract for employment with Defendant under which, for services performed by Plaintiff as the sole caretaker of Mrs. Martin, the Defendant was going to pay Plaintiff $2,816.00 monthly.
>
> 37. Plaintiff performed the services requested and required of her, despite demand thereof, she was not paid the wages she was promised per the oral agreement. (*Id.* at Exhibit 1).
>
> 38. Thus, the Defendant has breached the employment contract by failing to pay Plaintiff her promised and due wages for the services performed.

[ECF No. 1-2, Second Am. Compl. ¶¶ 36-38].

Pursuant to the evidence, Plaintiff earned and received more than $2,816.00 per month. As the checks evidencing Plaintiff's wage payments demonstrate, the Trust paid Plaintiff between $3,000 and $13,124 each month. Accordingly, the Court grants summary judgment as to Count I.

Similarly, Plaintiff pleads Count III (Unjust Enrichment) in the alternative to Count I. Plaintiff states that she "gave Defendant benefits but was not compensated fully for her services." [ECF No. 1-2, Second Am. Compl. ¶ 48]. The Court grants summary judgment on Count III for the same reasons as Count I: the wage payment checks evidence that Plaintiff earned and received more than the alleged $2,816.00 monthly salary.

## II. BREACH OF LIFETIME CONTRACT CLAIM

In Count II (Breach of Contract), Plaintiff argues that she entered into a contract for "lifetime" employment. Specifically:

> 42.  Plaintiff and Defendant entered into a valid and enforceable employment contract.
>
> 43.  The Employment Contract was memorialized in a writing. (*Id.* at Exhibit 2).

[ECF No. 1-2, Second Am. Compl. ¶¶ 42-43]. The "writing" attached to the Second Amended Complaint is an email ("Mrs. Kalos' Email") from Yael Kalos, who is Rabbi Kalos' wife, and states:

> I Yael Kalos, will manage Sasha during her employment. I will retain her permanently. I will not release her for as long as she wants employment. She will report only to me.  Yael Kalos

[*Id.,* Ex. 2]. Mrs. Kalos is not a Trustee.

The Court grants summary judgment on Count II for three reasons.

First, Mrs. Kalos' Email is not an employment contract. Under Florida law, employment contracts that do not specifically obligate the contracting parties to a definite term of employ-

- 9 -

ment are terminable at will and will not support a breach of contract claim for damages. In *Wynne v. Ludman Corp.*, the Florida Supreme Court held:

> No action can be maintained for the breach of a contract to employ unless there is some stipulation as to the length of time for which the employment shall continue. ***If a term of employment be discretionary with either party, or be indefinite, either party may terminate it at any time.***

79 So. 2d 690, 691 (Fla. 1955) (emphasis added).

In the absence of a contract for a specified length of time, employees in Florida are considered to be at-will. *See DeMarco v. Publix Super Markets, Inc.*, 384 So. 2d 1253, 1254 (Fla. 1980). An at-will employment relationship may be terminated at any time and for any reason, including no reason, by either party. *See Muller v. Stromberg Carlson Corp.*, 427 So. 2d 266, 270 (Fla. 2d DCA 1983) ("[i]t is settled law in Florida that an employment contract which is indefinite as to term of employment is terminable at the will of either party without cause.").

Second, Plaintiff admits in her interrogatory responses that the parties did not enter into a written employment agreement:

> ***We were in the process [of] signing employment agreement before my sudden termination***. Every time we made changes to the employment agreement, we always agreed orally first. Since I was not given any draft right after our oral agreement, each time I receive[d] the finalized employment contract it was totally different from what we agreed upon orally.

[ECF No. 46-3, Pl. Interrog. Response No. 10 (emphasis added)].

Third, attempting to avoid the at-will doctrine, Plaintiff argues that Mrs. Kalos' Email is a "*lifetime*" employment contract based on Mrs. Martin's life. "Contracts for 'lifetime' or 'permanent' employment are not favored in the law, and courts rarely enforce them because of their indefiniteness and uncertainty." *Hesston Corp. v. Roche*, 599 So. 2d 148, 150 (Fla. 5th DCA 1993). Contracts for lifetime employment are typically unenforceable and fail for indefiniteness, lack of mutuality, and failure of consideration. *See Hamlen v. Fairchild Indus., Inc.*, 413 So. 2d 800, 800-01 (Fla. 1st DCA 1982).

As the court observed in *Hesston*:

[S]uch promises of "lifetime" employment are usually "oral uncorroborated, vague in import and details and highly improbable." Also, courts question the inherent fairness of an agreement that places the entire burden of the long-term commitment on the employer since no comparable commitment exists on the part of the employee[.]

*Hesston*, 599 So. 2d at 151 (internal citations omitted).

In sum, Plaintiff has not alleged that an employment contract exists with a definite and fixed duration. Rather, she concedes that no written employment agreement exists. Moreover, any "lifetime" contract lacks mutuality and Plaintiff has not provided any consideration to support such an agreement. Accordingly, the Court grants summary judgment as to Count II.

### III. FRAUD IN THE INDUCEMENT CLAIM

In Count IV (Fraud in the Inducement), Plaintiff alleges that "the Defendant made false representations to Plaintiff to induce her of not leaving and finding another job." [ECF No. 1-2, Second Am. Compl. ¶ 53]. Plaintiff's only purported "misrepresentation" identified in the Second Amended Complaint is that, "In exchange for the Plaintiff not suing the Defendant, she would receive increased pay, retirement benefits, and continued employment by the Defendant." [*Id.* ¶ 53(b)]. In her interrogatory responses, Plaintiff identified one additional "misrepresentation": "Yael [Kalos] repeatedly told me [that] I and my husband are the one[s] designated to take care of Mrs. Martin to the end." [ECF No. 46-3, Pl. Interrog. Response No. 12].

A fraud in the inducement claim requires "(1) a misrepresentation of a material fact; (2) knowledge by the person making the statement that the representation is false; (3) intent by the person making the statement that the representation would induce another to rely and act on it; and (4) that the plaintiff suffered injury in justifiable reliance on the representation." *Tomasini v. Mount Sinai Med. Cntr.*, 315 F. Supp. 2d 1252 (S.D. Fla. 2004).

In this case, Plaintiff cannot prove any of the elements. Under these circumstances, there was no material misrepresentation as the Trust repeatedly offered Plaintiff increased pay, retirement benefits, and continued employment. These offers included, but were not limited to, the November 2015 draft of the written employment agreement (which the Trustees signed, but Plaintiff rejected), the February 3, 2016 employment offer delivered via email, and the May 20, 2016 employment offer. However, Plaintiff rejected each of the Trust's employment offers.

Moreover, Plaintiff cannot demonstrate any justifiable reliance on any of the purported misrepresentations. When the employment contract negotiations commenced, Plaintiff admitted that she did not want to work anywhere else:

> Because of the emotional attachment we have, after many attempts, I could not imagine myself working for someone else. When it comes to caring for Ms. Martin, it is not just only about a job and getting paid. It is about caring, love, and compassion too. Despite all difficult circumstances surrounding the job, I just made a difficult choice to renew my commitment and begin the most challenging new journey with Ms. Martin. . . . Please note that, if I am allowed, I want to be there for Ms. Martin anytime regardless of the outcome of this contract agreement.

[ECF No. 46-2, Ex. 1, Sept. 6, 2015 Email]. Accordingly, Plaintiff cannot prove any of the elements of a fraudulent inducement claim. The Court therefore grants summary judgment for Defendant on Count IV.

## IV. OVERTIME CLAIM UNDER THE FLSA

In Count V, Plaintiff states that the Trust violated the FLSA because she did not receive overtime, and seeks $245,606.40 in overtime pay. [ECF No. 1-2, Second Am. Compl. ¶¶ 20, 21]. Plaintiff's overtime claim is dismissed for two reasons.

First, the FLSA provides that "any employee who is employed in a domestic service in a household and who resides in such a household" is not entitled to overtime. 29 U.S.C. § 213(b)(21) (the "Live-in Domestic Service Exemption"); 29 C.F.R. § 552.102(a) ("[S]ection 13(b)(21) provides an exemption from the Act's overtime requirements for domestic service em-

ployees who reside in the household where employed."). "The term includes services performed by employees such as companions, babysitters, cooks, waiters, butlers, valets, maids, housekeepers, nannies, nurses, janitors, laundresses, caretakers...." 29 C.F.R. § 552.3; *U.S. v. Sabhnani*, 599 F. 3d 215, 256 (2d Cir. 2010) ("Because there is no doubt that Samirah and Enung lived in the Sabhnanis' house and did so as permanent residents for a considerable time, we conclude that the maids were 'employee[s] who [were] employed in domestic service in a household and who reside[d] in such household' for the purpose of the §213(b)(21) exemption."); *Almeida v. Aguinaga*, 456 F. Supp. 2d 505, 508 (S.D.N.Y. 2006) (plaintiff considered a domestic servant and therefore not entitled to overtime compensation under FLSA); *see also* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter on Fair Labor Standards Act (June 7, 1974), available at 1974 WL 38711 ("The housekeeper employed in that household, however, would be subject to the $1.90 an hour minimum wage, but she would be exempt from the Act's overtime provisions, since employees employed in domestic service in a household who reside in such household are exempt from the Act's overtime requirements.").

A live-in domestic service employee must reside on the employer's premises either "permanently" or for "extended periods of time."  Application of the Fair Labor Standards Act to Domestic Service, 78 Fed. Reg. 60,454, 60,474 (Oct. 1, 2013).  This Court explained:

> The Department of Labor recently stated that a domestic service employee is considered to be a "live-in" domestic service employee if she "resides on his or her employer's premises on a 'permanent basis' or for 'extended periods of time.'" Application of the Fair Labor Standards Act to Domestic Service, 78 Fed. Reg. 60,454, 60,474 (Oct. 1, 2013); *see also* 29 C.F.R. 785.23. "Further, in accordance with the Department's existing policy, employees who work and sleep on the employer's premises for five days a week (120 hours or more) are considered to reside on the employer's premises for 'extended periods of time.'" *Id.*  "If less than 120 hours per week is spent working and sleeping on the employer's premises, five consecutive days or nights would also qualify as residing on the premises for extended periods of time." *Id.*  "For example, employees who reside on the employer's premises five consecutive days from 9:00 a.m. Monday until 5:00 p.m. Friday (sleeping four straight nights on the premises) would be considered to reside on the employer's premises for an extended period of time." *Id.*

*Quintero v. Lopez,* No. 15-21162-CIV-LENARD, 2016 WL 7508264, at *6 (S.D. Fla. June 6, 2016). Hence, a worker resides on the employer's premises for an "extended period of time" when she (i) lives, works and sleeps on the employer's premises for five days a week (120 hours or more), or (ii) spends less than 120 hours per week working and sleeping on the employer's premises, but spends five consecutive days or nights residing on the premises. *See* DOL Field Operation Handbook § 31b20.

In this case, Plaintiff admits that she is a live-in domestic service employee, was required to sleep overnight seven days a week, and worked 136 hours per week. [ECF No. 1-2, Second Am. Compl. ¶ 16]. Plaintiff's interrogatory responses confirm that she slept in Mrs. Martin's residence for, at least, five (5) days per week. [ECF No. 46-3, Pl. Interrog. Response No. 13]. Plaintiff concedes that her primary duties were cleaning and "caring for Ms. Martin (cooking, showering, keeping up her daily schedule, etc.)." [*Id.*]. Accordingly, Plaintiff is a live-in domestic service employee and, pursuant to the Live-in Domestic Service Exemption, is exempt from overtime pay.

Second, the FLSA exempts from minimum wage and overtime pay any domestic service employee who is hired to provide "companionship services for individuals who (because of age or infirmity) are unable to care for themselves." 29 U.S.C. § 213(a)(15) (the "Companionship Exemption"). "Companionship services" are defined as:

> [T]he provision of fellowship and protection for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself. The provision of fellowship means to engage the person in social, physical, and mental activities, such as conversation, reading, games, crafts, or accompanying the person on walks, on errands, to appointments, or to social events. The provision of protection means to be present with the person in his or her home or to accompany the person when outside of the home to monitor the person's safety and well-being.

29 C.F.R. § 552.6(a). Work under the Companionship Exemption includes "such activities as cleaning the patient's bedroom, bathroom or kitchen, picking up groceries, medicine, and dry

cleaning would be related to personal care of the patient and would be the type of household work that would be exempt work for purpose of section 13(a)(15) of the FLSA." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter on Fair Labor Standards Act (March 16, 1995), available at 1995 WL 1032475.  Employees falling within the Companionship Exemption include caretakers.  29 C.F.R. § 552.3. "Considering the history and development of the home care industry, it is fair and reasonable for the exemption to benefit home care recipients and their families when the families directly hire domestic service workers; the result is that the ordinary family will not also incur the financial burden of overtime pay." *Tinsley v. Covenant Care Serv., LLC*, 228 F. Supp. 3d 911, 918 (E.D. Mo. Jan. 12, 2017).  Companionship services also include "general household work," so long as the general household work "does not exceed 20 percent of the total weekly hours worked."  29 C.F.R. § 552.6.

In this case, the Companionship Exemption applies. As Plaintiff concedes, she was Mrs. Martin's "sole caretaker" and has a "mother-daughter" relationship with her.  [ECF No. 1-2, Second Am. Compl. ¶¶ 11, 15, 60-64].  Plaintiff worked as a live-in domestic services employee for Mrs. Martin due to Mrs. Martin's "declining health" and her typical duties included "cleaning Mrs. Martin's home and condo; cooking; coordinating the maintenance work in both residences, maintaining Mrs. Martin's calendar, and managing Mrs. Martin's phone calls." [*See* ECF No. 36, Proposed Third Am. Compl. ¶¶ 13, 15].  Any general household work that Plaintiff performed was always related to Mrs. Martin's care and did not exceed 20 percent of the total hours that Plaintiff worked each week, particularly since she admits that she was coordinating the maintenance of Mrs. Martin's property.  *Id.*  Accordingly, summary judgment is appropriate.  *See Rodriguez v. Jones Boat Yard, Inc.*, No. 09–23195–CIV-BANDSTRA, 2010 WL 7325250 (S.D. Fla. July 26, 2010) (granting summary judgment to defendants under the companionship services exemption); *Feldman v. Bhrags Home Care, Inc.*, No. 15-cv-5834, 2017 WL

1274055 (E.D.N.Y. Mar. 10, 2017) (granting judgment on the pleadings to employer because plaintiff's services constituted exempt companionship services.).

For the above reasons, the Court grants summary judgment as to Count V.

### **CONCLUSION**

Based on the foregoing, it is:

**ORDERED AND ADJUDGED** that Defendant's Summary Judgment Motion [ECF No. 48] is **GRANTED**.  Pursuant to Federal Rule of Civil Procedure 58, final judgment will be entered separately. This action is **CLOSED** for administrative purposes.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 10th day of September, 2018.

_____
DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel for Parties